Filed 6/5/25  P. v. Quinonez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ISRAEL QUINONEZ,<br><br>    Defendant and Appellant. | F087445<br><br>(Super. Ct. No. BF191243A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Bulldog Law, Mario Tafur, and Joshua J. Schroeder for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Isreal Quinonez appeals his convictions on two counts of attempted murder (Pen. Code, §§ 187, subd. (a), 664;[1] counts 1, 9); two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 2, 3); two counts of assault with a firearm (§ 245, subd. (a)(2); counts 4, 5); one count of unlawfully possessing a firearm (§ 29800, subd. (a)(1); count 6); one count of unlawfully possessing ammunition (§ 30305, subd. (a)(1); count 7); and one count of delaying a peace officer (§ 148, subd. (a)(1); count 8), along with various enhancements. Appellant makes several broad claims that his rights were violated throughout the course of his trial, alleges both judicial and prosecutorial misconduct, asserts he received ineffective assistance of counsel, and challenges the sufficiency of the evidence presented. For the reasons set forth below, we strike the convictions for counts 4 and 5 and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 9, 2022, a 911 call was placed after witnesses heard and saw the aftermath of a shooting in Bakersfield. When the police arrived, they found a man with an injury consistent with a gunshot wound to his right leg, unconscious, and bleeding profusely. The police identified the bleeding man, Rodolfo Galaviz, with his driver's license. Under questioning from defense counsel, it was noted that Galaviz had a large "W" tattooed on his side, which is known as a symbol for a local street gang in the area of the shooting, the Westside Bakers. The police also identified several witnesses and collected video evidence from nearby businesses.

One video came from a nearby smoke shop. Freddy Garcia, a customer at the time of the shooting, testified he was getting a drink when he heard gunshots. He looked up toward the surveillance camera monitors and, through the glass and out of the corner of his eye, saw a man running away holding a pack of beer. The person running away was never identified but was claimed to be a second victim referred to as "John Doe" during

---

[1] Undesignated statutory references are to the Penal Code.

2.

the proceedings. The surveillance video showing this person was entered into evidence through Garcia's testimony.

Garcia went outside and saw a different person, who had run a different direction from the person with a pack of beer, turn a nearby corner and fall down. Garcia also saw a little blood on the sidewalk and another person riding a bike down a nearby street.

While outside, Garcia saw someone he believed was the owner of a nearby market call 911.[2] Noticing that person was having trouble speaking English and conveying the need for help, Garcia took the phone and spoke with the 911 operator. That call was entered into evidence through Garcia's testimony as exhibit No. 10.

Another two videos showed a nearby residence occupied by Brian Leach. Leach testified that he was home on the day of the shooting, where he runs a bicycle repair shop out of his garage. That day, a person Leach knew by the name of Bowser stopped by Leach's shop while riding a bicycle. Leach was able to identify appellant as Bowser in court.

Leach testified at trial that he did not recall much about that interaction and was not paying much attention. Leach then denied making several statements to the police, including that he had seen appellant with a .380-caliber weapon at the time, that he knew appellant had been the shooter, and that he had heard the gunshots after appellant left.

After these denials, Leach admitted he was not in court voluntarily. Although he denied being scared to testify, he stated, "It's just I have to live in this place. Where I live is, you know, it's not an easy area to live in." Under questioning from defense counsel, Leach admitted the Westside Bakers was a gang in his area, affirmed he didn't want to be marked as a snitch because "[t]hey get beat up and worse," and denied seeing any injuries

_____

[2]     On the transcript submitted, this person was identified as "Issam Fatouhi" and is referred to in the briefing as Mr. Fatui. The record does not show that this is a correct attribution for the caller, but for consistency, this court will refer to the initial caller as Fatui.

3.

on appellant the day of the shooting. Two videos showing appellant enter Leach's garage (exhibits Nos. 7(a) & 7(b)) were introduced into evidence through Leach's testimony.

In response to Leach's denials, two videos of his discussions with the police on the day of the shooting were introduced into evidence. In the videos, Leach stated he saw "a 380," which the testifying officer explained was typically a semiautomatic firearm. Leach also stated the shooter had been in his garage just before the shooting and pointed the officer to where shell casings could be found.

A third witness, Kyle Shepherd, also testified that he heard gunshots while inside a nearby laundromat and, upon exiting to see what was happening, saw a person wearing a white T-shirt on a bike nearby. Shepherd was able to confirm that the person he saw was the same person seen on another surveillance video from the area, but when asked if he saw that person in court, he stated, "I don't believe I do." On cross-examination, defense counsel elicited that the laundromat was in a rough neighborhood but, after an objection to a question about gangs in the area, chose not to question Shepherd further, ended his questioning, and excused Shepherd subject to recall.

The police investigation into the shooting resulted in additional evidence. For example, a white vehicle near where Galaviz fell was found to have a bullet hole in a rear quarter panel. Much of the investigation was done by Officer Alan Guardado, who located blood spatter, collected video evidence, and interviewed witnesses. Officer Guardado located two spent casings for a .380-caliber weapon, one branded by SIG Sauer and the other by Remington. Officer Guardado explained that spent cases are typical byproducts of shots fired from semiautomatic weapons. Officer Guardado also observed video evidence showing a person walking a bike toward the scene of the shooting from Leach's residence and then frantically riding it away from the area around the time of the shooting. Officer Guardado was able to identify appellant as the individual known as Bowser.

In August 2022, the police located appellant traveling by bicycle near the area of the shooting and sought to arrest him. When the police stopped their vehicle in front of appellant with their lights on and gave him a verbal command to stop, appellant ran. This interaction was caught on video and introduced into evidence. Appellant was apprehended, however, and eventually gave a statement to police.

The video of appellant's statement was introduced into evidence. In the statement, which was at times disjointed, appellant initially denied any role in the shooting. After being told about potential DNA evidence, appellant claimed he may have touched ammunition in the past. When offered a chance to claim a reason for the shooting, appellant stated he had been attacked by some unnamed group of five individuals. Ultimately, appellant admitted to previously possessing a gun with a rack, which the testifying officer explained is a semiautomatic weapon, and to firing at a single person he saw exiting a store because that person had been involved in the prior alleged attack on appellant. Appellant stated he had been attacked because he was "slipping," a term described by the testifying officer as when "a PC[3] or dropout is caught walking through the same gang territory from which they dropped out of."

Based on this evidence, appellant was charged and eventually convicted by a jury of the nine counts noted above. The convictions also included enhancements for personally and intentionally discharging a firearm (§ 12022.53, subd. (c)) and personally and intentionally discharging a firearm proximately causing great bodily injury (§ 12022.53, subd. (d)) on counts 1 and 9,[4] personally using a firearm (§ 12022.5, subd. (a)) on counts 2 through 5, and personally inflicting great bodily injury (§ 12022.7,

---

3    "PC" refers to someone who has been in protective custody.

4    The court eventually struck the enhancement for personally and intentionally discharging a firearm proximately causing great bodily injury on count 9 and applied the jury's finding only to count 1.

subd. (a)) on counts 2 and 4.  For counts 1 through 7 and 9, additional allegations found true in bifurcated proceedings included that appellant had suffered a prior serious felony conviction (§ 667, subd. (e)) and that several aggravating factors were present.  The court, however, struck appellant's prior serious felony conviction.  Appellant was eventually sentenced to consecutive terms of life with the possibility of parole, plus 25 years to life on count 1, and life with the possibility of parole, plus six years eight months on count 9.  Appellant received a concurrent term of one year on count 8, and his remaining convictions on counts 2 through 7 were stayed (§ 654).  This appeal timely followed.

## DISCUSSION

Appellant's briefing is split into five general categories.  The first, containing 10 subparts, identifies issues he claims have been preserved for appeal.  The second alleges the trial judge was biased.  The third asserts ineffective assistance of counsel based on three issues.  The fourth, containing nine subparts, alleges prosecutorial misconduct.  The fifth raises a claim that substantial evidence does not support the verdict.  Our analysis generally tracks this structure but waits to consider the ineffective assistance claims until after considering the prosecutorial misconduct allegations.

### *Appellant's Preserved Matters Arguments Do Not Show the Trial Court Erred*

Appellant's briefing opens with a recitation of 10 issues where appellant contends the trial court erred during trial.  For the first nine issues, appellant identifies one or more places in the record, makes an assertion of error, and claims that error is prejudicial.  At no point in any of these nine issues does appellant cite to any case law or attempt to explain how his contention fits into a relevant legal framework for finding prejudicial error.  The tenth issue appears to contain four subarguments which suggest they cover the full scope of the trial's evidence.  In several of the 10 issues, the headings provided do not necessarily match the general arguments made within.  As discussed below,

appellant's arguments are insufficient to preserve these issues on appeal and we find appellant has forfeited them.  Notably, this court's review also finds no error warranting reversal.

*Standards of Review and Applicable Law*

Appellant's arguments cover a broad range of trial, procedural, and evidentiary issues.  Accordingly, we include citations to relevant principles within each set of issues raised.  In general, however, this court "applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)  Similarly, discretionary matters, such as whether to allow leading questions, are also reviewed for abuse of discretion. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 401.)  Whether a particular jury instruction was required is generally a mixed question of law and fact that we review de novo, as is the question whether a jury instruction is a proper statement of the law. (*People v. Sorden* (2021) 65 Cal.App.5th 582, 616 [whether instruction was required]; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [whether instruction is correct statement of the law].)

Subject to certain exceptions, to preserve issues for appeal, an objection must be made to the trial court. (See *People v. Partida* (2005) 37 Cal.4th 428, 433–434 [timely objection on specific grounds required to preserve objection to erroneous admission of evidence].)  Similarly, certain jury instruction objections can be forfeited if no objection was raised to the trial court. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 750 [" 'A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.' "].)  Finally, the failure to properly raise a disputed issue on appeal can forfeit that contention as well. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*) [" '[E]very brief should contain a legal argument with citation of authorities on the points

made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "].)

*Appellant Has Forfeited His Allegations of Error*

The People argue appellant has forfeited his appellate claims because they "do not contain references to legal authority or any legal analysis."  Under the rules of court and long-settled case law, the perfunctory identification of a claim and failure to support it with legal argument and relevant citation to authority allows the court to treat the point as forfeited.  (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Stanley, supra*, 10 Cal.4th at p. 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "]; *People v. Smith* (2003) 30 Cal.4th 581, 616, fn. 8 ["We need not consider such a perfunctory assertion unaccompanied by supporting argument."].)

We agree the lack of meaningful legal argument and citation to authorities warrants forfeiture here.  Appellant's arguments span several diverse legal principles.  Across the first nine allegations made, he raises, among many others, challenges to the form and function of questions posed by the prosecutor; the foundation of video and audio evidence submitted; the foundation for identifying potential gang affiliations and the nature of Galaviz's wound; the ordering of witnesses called and the manner in which they were presented; the form of certain jury instructions; and the prosecutor's closing arguments.  In doing so, appellant raises a host of unsupported complaints; from confrontation clause concerns to a belief the court simply ignored objections to claims of prosecutorial misconduct.  Yet none of these underlying claims are directly tied to any legal precedent or any argument other than thinly described claims of "structural error."

As one example, appellant contends the court improperly precluded questions concerning whether Galaviz was a known gang member.  Appellant's claims consist of a

citation to the place in the record where the questions were asked, a citation to where a sidebar concerning the issue was summarized, and the following argument: "Despite the Court's allowance of evidence about gang affiliation if proper foundation was set, the exclusion of this evidence as it appears foundation was set to elicit proper testimony does not square with the Court's inclusion of gunshot wound evidence above in Part I(iv) when it was similarly objected to by the defense for lack of foundation. Structural error resulted from this error that precluded Appellant from a fair trial." Appellant's other arguments are all similarly presented. This significant failure warrants forfeiture.

We note, however, that even if these issues have been preserved, appellant has shown no error. This court has reviewed the issues raised and finds they do not demonstrate error, let alone reversible error. We briefly consider a few examples. None of the issues identified by appellant raised substantially stronger arguments.

In assertions concerning questions asked of Leach, appellant contends that several aspects of Leach's testimony and the questions asked of him were improper. Appellant's assertions demonstrate no error by the trial court. Appellant challenges questions asking whether Leach had made certain statements to the police that contradicted his lack of knowledge at trial, and the subsequent introduction of the body camera video showing Leach's prior statements. Such questions are not only proper but necessary to support the allowable introduction of extrinsic evidence for impeachment purposes. (See Evid. Code, §§ 770, 1235; *People v. Strickland* (1974) 11 Cal.3d 946, 954 [finding questioning witness about prior recorded testimony proper and supported admission of video as prior inconsistent statement even in light of constitutional right to confront witnesses].)

Nor does such questioning demonstrate a confrontation clause violation. Appellant's "argument erroneously equates confrontation with a cross-examination which is effective from a defense point of view. This is not what the constitutional right to confront witnesses requires." (*People v. Perez* (2000) 82 Cal.App.4th 760, 765.) "When

9.

the declarant 'is present at trial and subject to unrestricted cross-examination,' 'the traditional protections of the oath, cross-examination, and the opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements.' " (*Id.* at pp. 765–766.)

While appellant challenges the video evidence submitted showing Leach's statements, admitting exhibits Nos. 7(a) and 7(b) was proper. The videos were a fair and accurate representation of the day of the shooting and show appellant enter Leach's garage based on Leach's testimony. "A photograph or video recording is typically authenticated by showing it is a fair an accurate representation of the scene depicted. [Citations.] This foundation may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267–268.) The record shows authentication occurred.

Further, despite appellant's claims that questions asking whether Leach was afraid of being labeled a snitch were generally improper, it is well settled that witnesses can be questioned on potential biases or bases for conflicts in their testimony. " 'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court. [Citations.]' [Citations.] '[T]here is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is "directly linked" to the defendant.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 668, fourth bracketed insertion added.) Here, after a series of denials related to alleged past statements to police, the prosecutor affirmed Leach was not testifying voluntarily and did not want to be there and asked if Leach was scared to testify. All of these questions were proper, and it was only defense counsel who later

10.

suggested the issue could be related to how gangs treat perceived snitches. Nothing in these exchanges show error, let alone reversible error.

As another example, we find no error in the assertions related to questions regarding Galaviz's gang affiliation. After sustaining a foundation objection to a question asking whether Officer Hearn determined Galaviz was a member of the Westside Bakers, the record shows the trial court instructed defense counsel that if he "wanted to ask questions of Officer Hearn about gang [*sic*], that was fine but to make sure to lay the appropriate foundation." Defense counsel intended to do so with respect to another witness provided "Officer Hearn was subject to re-call just in case." Counsel did not then take any further steps to lay a foundation for Officer Hearn to identify Galaviz as an active member of the Westside Bakers, and appellant makes no argument the prior foundation laid with respect to the gang tattoos was sufficient to support the opinion. Thus, the record does not demonstrate any evidence was improperly excluded based upon the court's ruling. Rather, it shows the court would have permitted the evidence if a foundation was provided, but counsel chose not to proceed at that time. Despite this, the record shows counsel elicited gang evidence in the form of an identification of Galaviz's tattoo, a tie between Galaviz's tattoo and the Westside Bakers, and confirmation that the shooting occurred in Westside Bakers' territory.

We likewise find no error in the assertions the court improperly excluded a jury instruction or gave an improper jury instruction on self-defense. With respect to the excluded jury instruction assertion, appellant contends Leach admitted to being untruthful but that the trial court only gave a modified version of CALCRIM No. 226 that was "not going to include did the witness admit to being untruthful or has the witness been convicted of a felony because we don't have that evidence as to witnesses." Notably, the version of CALCRIM No. 226 given did include the following factors for the jury to consider regarding the credibility of witnesses, among others: "How well was the

11.

witness able to remember and describe what happened?"; "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?; and "Has the witness engaged in other conduct that reflects on his or her believability?"

While the court must instruct on all theories supported by the evidence, "it is not error to fail to give *any* such instruction if the evidence does not warrant it." (*People v. Horning* (2004) 34 Cal.4th 871, 908.) Appellant has not identified, and this court has found no place, where Leach admitted to being untruthful. Rather, Leach was presented with inconsistencies in his testimony and claimed not to remember making those statements. The instructions given covered these types of inconsistent statements. There appears to be no basis in the record for requiring the trial court to give the contested instruction, and thus no error has been shown.

With respect to the jury instruction on self-defense assertion, appellant contends the fact "John Doe" was added as a victim by interlineation to the jury instruction on self-defense shows error because the jury "may have concluded that no defense was available regarding John Doe's actions." As the People note, no objection was raised to this instruction, forfeiting it for appeal. (*People v. Delgado* (2017) 2 Cal.5th 544, 575 ["Because this argument merely goes to the clarity of the instruction, it is forfeited by defendant's failure to object below."].) Regardless, the record shows no error. There is no challenge that the instruction was incorrect on the law. Even if the written interlineation is viewed as potentially confusing—a conclusion this court does not see when reviewing the record—the instructions were also read to the jury in a format that correctly identified the counts subject to the defense and that both victims' actions were covered by the instruction. The jury was aware the instructions applied to John Doe's actions.

Finally, we look separately at appellant's tenth assertion because it contains multiple subheadings. We conclude the first three subheadings all raise issues identical to

the nine assertions that preceded them and again fail based on forfeiture and a lack of merit. The fourth subheading, however, titled "*The Prosecution Caused Hobbesian Perversions of the People of California's Sovereignty*," takes a new turn. The argument begins by arguing "that prosecutorial discretion allows for the prosecutor to exclude certain witnesses to shape the case," before contending "non-participation or resistance to prosecutions are valid choices" by victims that result in an improper prosecution if the People proceed despite the victims' objections. Weaving together references to a United States Supreme Court case from 1793; Hobbes, Leviathan (1651); Louis XIV; and a recent case concerning presidential authority, appellant contends the prosecutor could not pursue this case because nobody proved Galaviz and John Doe were victims or that they supported the prosecution. Appellant then invites this court to "create meaningful distinctions between California and any other Court that wishes to dabble in the Hobbesian perversions Justice Wilson warned of .…"

We decline appellant's invitation. Appellant points to no legal principle which requires the prosecution of a crime be sanctioned by the victim. It is frequently the case that the victim does not testify in a matter, nor is it required. (See CALCRIM No. 300 [neither side required to call witnesses who may have information]; *People v. Morales* (1975) 49 Cal.App.3d 134, 138–139 [defendant originally convicted despite robbery victim not testifying at trial]; *People v. Hughey* (1987) 194 Cal.App.3d 1383, 1394–1395 [finding victim's out-of-court statement properly admitted and conviction properly supported despite victim not testifying at trial].) Imposing a victim authorization requirement to prosecute is not a concept well known in the law, nor one which this court would entertain under such a limited and unsupported argument. As the People note, public prosecutors, within their discretion, "shall initiate and conduct on behalf of the people all prosecutions for public offenses," and the district attorney "shall institute proceedings … for the arrest of persons charged with or reasonably suspected of public

13.

offenses when [they have] information that such offenses have been committed." (Gov. Code, §§ 26500, 26501.) While it is well settled that the prosecutor may take a victim's statements into account when deciding whether to prosecute, the decision to prosecute remains within the discretion of the People. (See *People v. Gwillim* (1990) 223 Cal.App.3d 1254, 1276.) Appellant has therefore failed to demonstrate error.

### *Appellant's Judicial Bias Argument Is Unfounded*

Appellant next argues that "Judge Brehmer was biased and structural error resulted." (Boldface & some capitalization omitted.) This assertion finds no support in the record.

After outlining the general standard of review for judicial bias claims, appellant presents an analysis which makes the following claims, quoted verbatim from the briefing: (1) "[E]veryone involved in this trial succumbed to implicit biases against Hispanic males that run deep in California, including Judge Brehmer"; (2) "[T]he Court also suffered from a confirmation bias also [*sic*] went to the common prejudice in Bakersfield that homeless people or poor people are more likely to commit crimes that is reflected by a trend in many cities including Bakersfield of making homelessness itself a crime"; (3) "[I]mplicit biases against Hispanic males overawed the weight of all other evidence presented at trial"; (4) "A judge who is overly indulgent of a community in fear of Hispanic gangs—especially the Westside Baker gang and as a result Judge Brehmer was perceived to be and actually was such a biased judge in Appellant's criminal trial"; and (5) While "not arguing that Hon. Brehmer intended to express bias during this trial," "but for Hon. Brehmer's implicit biases including his bias for protecting a community struggling under the violence that a largely Hispanic gang unleashes there, and against

14.

homelessness and poor people," "the court did not understand the motives upon which the crimes alleged here rested" and "allowed the prosecutor to exploit its bias." [5]

Following these accusations, appellant presents as supporting proof what appears to be four instances where the trial court directed questions to witnesses, two objection rulings, and an issue with the jury instructions. We begin by recounting the identified questioning of witnesses.

In the first, the prosecutor was questioning Officer Montejo about certain photographs taken of the crime scene. When asked where Galaviz was located in relation to one of those photographs, confusion arose regarding how to describe that location in connection to the location of a white vehicle in the image. In this exchange, defense counsel objected that the question on location had been asked and answered. In response, the trial court asked clarifying questions of the witness. The court's involvement reads as follows:

"THE COURT: I think it all has to do with one's perspective, but in any event, where is this white vehicle located? What street is it on?

"[MONTEJO]: 8th Street.

"THE COURT: Okay. Where is Chester?

"[MONTEJO]: It's just east of that vehicle.

---

[5] To support these arguments on implicit bias, counsel relies on Kahneman, Thinking Fast and Slow (2011). Counsel requests this court take judicial notice of the "fact and proposition of generalized knowledge that human beings are not automatically rational … that necessarily causes human beings to predictably and consistently fall into patterns of implicit bias including confirmation bias that requires necessary updates to judicial decision-making heuristics." We do not find this point or the book it relies upon to be of the type and nature that would warrant judicial notice. (See *Weitzenkorn v. Lesser* (1953) 40 Cal.2d 778, 787 [" 'If there is any doubt whatever either as to the fact itself or as to its being a matter of common knowledge, evidence should be required.' "].) Appellant's point is one upon which expert testimony would typically be required. The request is therefore DENIED.

15.

"THE COURT:  If you're using the laser pointer, will you point where it is.

"[MONTEJO]:  Where Chester is at?

"THE COURT:  Yeah.  [¶]  Okay.  So from this photograph, it's behind the white vehicle would be where Chester is?

"[MONTEJO]:  Yes.

"THE COURT:  Okay.  Go ahead."

In the second instance, the prosecutor was asking Garcia whether he recognized the voice of the other caller on a recording of the 911 call made after the shooting.  When asked if the voice was "the gentleman that you heard speaking to 911," defense counsel objected to the question as leading, and the court overruled that objection.  Garcia then stated he was unsure of the voice because "the other guy spoke a little bit more of another language," and Garcia would probably need to hear more of the recording to be sure.  The prosecutor then asked permission to continue the call, and the court engaged in the following colloquy with the witness:

"[PROSECUTOR]:  With the court's permission.

"THE COURT:  Before this part or after this part, he spoke another language?

"[GARCIA]:  The fellow that I was speaking with, he didn't—he was Arab.  He didn't know actually, like, no English.

"THE COURT:  So this is some other person you think?

"[GARCIA]:  Most likely it might be another person.

"THE COURT:  Do you recognize this conversation, or were you present for this or no?

"[GARCIA]:  No.  When I saw the guy not being able to speak proper English, I just instantly said, 'Hey, can I get the phone?'  I grabbed it, started speaking for him, spoke about what was happening.  Somebody got shot on Chester and 8th then—

16.

"THE COURT:  Maybe we'll play a little bit more, see if you recognize your voice or not."

Following this, the witness recognized his voice in the recording, made statements authenticating the recording, and the court admitted the recording as exhibit No. 10.

In the third instance, the prosecutor was questioning Officer Hearn on his knowledge of gunshot wounds.  In the course of several questions about Hearn's experience with gunshot wounds, the following question, objection, and comment from the court arose:

"[PROSECUTOR:]  Is there a difference between an entry and exit wound as it relates to the human body?

"[HEARN:]  Yes there is.

"[PROSECUTOR:]  What is the difference?

"[DEFENSE COUNSEL:]  Objection.  Lack of foundation.  Lack of expertise.

"THE COURT:  One is where the bullet goes in; one is where the bullet comes out; right?

"[HEARN]:  Correct.

"THE COURT:  Okay.  Next Question."

Finally, in the fourth instance, the prosecutor was asking Officer Guardado about the operation and mechanics of semiautomatic firearms.  In the course of that questioning, the following exchange occurred:

"[PROSECUTOR:]  [¶]  Q.  Do the firearms typically eject in any sort of rhyme or reason?

"[DEFENSE COUNSEL]:  Objection.  Lacks foundation.

"THE COURT:  What are we talking about, just any firearm?

"[PROSECUTOR]:  Generally.

"THE COURT: Wouldn't that change a little bit depending on what type of weapon it was?

"[GUARDADO]: Typically, yeah, with rifles, pistols, shotguns.

"[PROSECUTOR]: [¶] Q. Let me be more specific. With a handgun when a casing is ejected, does it follow the same pattern of ejecting every time?

"[DEFENSE COUNSEL]: Objection. Lack of foundation. This witness doesn't have that expertise.

"THE COURT: Sustained without foundation."

From this point, the prosecutor elicited more specific information on the dispersion pattern of expended shell casings until the following exchange regarding one of the casings found occurred:

"[PROSECUTOR]: [¶] Q. Sure. The SIG Sauer, the .380 that you located, is that consistent with having been fired from a semiautomatic firearm?

"[DEFENSE COUNSEL]: Objection. Speculation.

"THE COURT: Can a .380 be fired from a semiautomatic as well as a revolver?

"[GUARDADO]: I believe, to my understanding, yes.

"THE COURT: Okay. Sustained."

From there, the prosecutor, over appellant's objections, elicited testimony that the fact both of the casings were found was consistent with the claim they were fired from a semiautomatic firearm.

In addition to these issues with judicial questions, appellant adds an argument regarding the failure to instruct on witnesses admitting to being untruthful discussed above. The argument, two sentences in length, states: "The arguments in Part I(vi) above

are repeated in their entirety here. Structural and harmful error resulted, and Appellant was precluded his right to a fair trial."**6**

*Standard of Review and Applicable Law*

Appellant's arguments focus on a general assertion of "structural error" arising from the bias allegations. Accordingly, the challenge "is not based on California's substantial state statutory system for dealing with alleged judicial bias, which requires those concerned about judicial bias to file a statuary disqualification motion in the trial court and, if dissatisfied, to petition for writ of mandate, which is the exclusive means of review." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 588 (*Schmidt*).)

This leaves appellant pursuing a due process argument. "A criminal defendant has due process rights under both the state and federal Constitutions to be tried by an impartial judge. [Citations]. Indeed, '[i]t is axiomatic that "[a] fair trial in a fair tribunal is a basic requirement of due process." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 455, first bracketed insertion added.) However, "the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found." (*People v. Freeman* (2010) 47 Cal.4th 993, 1005.)

Under such a claim, the questions are whether there are " 'interests that tempt adjudicators to disregard neutrality' " and whether " 'the average judge in [their] position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias." ' " (*People v. Freeman, supra*, 47 Cal.4th at p. 1005.) "The appellate court's role is not to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid, but to determine whether the judge's

---

**6** Notably, we found this argument forfeited based on a failure to provide any meaningful argument or citation to law and found no error. Incorporating it in full adds no meaningful support to appellant's claim of judicial bias.

19.

behavior was so prejudicial it denied the party a fair, as opposed to a perfect, trial." (*Schmidt, supra*, 44 Cal.App.5th at p. 589.) Even numerous and continuous rulings against a party are not enough to meet this standard. (*Ibid.*)

"Potential bias and prejudice must clearly be established by an objective standard." (*People v. Chatman* (2006) 38 Cal.4th 344, 363.) " ' "[W]e of course presume the honesty and integrity of those serving as judges." ' " (*Id.* at p. 364.) Our review is de novo. (*Schmidt, supra*, 44 Cal.App.5th at p. 589.)

*Appellant's Claim Is Unfounded*

Upon review, this court finds no support for a constitutional due process violation based on judicial bias. Indeed, the record cited by appellant is wholly devoid of any such facts. The instances where the court questioned witnesses bear no objective hallmarks of bias. When read in context, they are nothing more than the court asking questions designed to clarify points of confusion or to assist the court in resolving a pending objection. It is well settled that the trial judge has not only the authority but an obligation to manage the proceedings in their courtroom and ensure the presentation of evidence is not marred by unnecessary confusion. (*People v. Carlucci* (1979) 23 Cal.3d 249, 255.)

The remaining issues identified by appellant consist of routine rulings that were resolved against appellant and are otherwise appealable. It is again well settled that such adverse appealable rulings do not to rise to the level of a constitutional violation of due process. (See *People v. Pearson* (2013) 56 Cal.4th 393, 447.)

Finally, we note that appellant identifies no point in the lower court proceedings where objections or a motion to disqualify were made based on judicial bias assertions. This strongly supports finding no merit in appellant's claims. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1112, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) We thus reject appellant's judicial bias allegations.

**_Appellant's Prosecutorial Misconduct Arguments Are Unfounded_**

Appellant raises nine contentions related to prosecutorial misconduct from the trial proceedings. Although appellant provides a roughly five-page standard of review discussion that contains many principles related to prosecutorial misconduct claims, within the roughly 15 pages dedicated to the nine specific contentions, there is not a single citation to any case law or statute. Rather, appellant relies on a general contention that "these instances of misconduct separately and cumulatively deprived Appellant of his right to a fair trial" and certain claims about improper prosecutorial conduct resulting in prejudicial "structural error." In reply, appellant raises misconduct claims allegedly arising in the People's appellate briefing.

*Standard of Review and Applicable Law*

"We review claims of prosecutorial misconduct pursuant to a settled standard. 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

"We review the trial court's rulings on prosecutorial misconduct for abuse of discretion." (*People v. Peoples* (2016) 62 Cal.4th 718, 792–793 (*Peoples*).) Thus, " ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and

requested that the jury be admonished to disregard the impropriety." ' " (*People v. Dykes, supra*, 46 Cal.4th at p. 760.)  Where no objection is made, " 'the point is reviewable only if an admonition would not have cured the harm caused by the misconduct' " or an objection would be futile.  (*People v. Clark* (2016) 63 Cal.4th 522, 577 (*Clark*).)

*Appellant Has Forfeited His Prosecutorial Misconduct Claims*

Appellant's prosecutorial misconduct claims have been forfeited both at the trial court level and at the appellate level.  Across the nine identified grounds of prosecutorial misconduct allegedly arising before the trial court, appellant identifies only one time—in his burden-shifting argument—where an objection was raised.  Further, in the limited times where appellant attempts to argue that objecting would have been futile, appellant's arguments fail.  For example, when discussing alleged prosecutorial misconduct surrounding questions asked to Leach, appellant states it would have been futile to object "because the prosecutor's ploy worked on the defense counsel and the court."  Appellant fails in any meaningful way to explain why a curative instruction would have been futile, if any error had been found to exist.  (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853 [noting claim of futility must find support in the record and that ritual incantation that an exception applies is not enough].)  Accordingly, appellant has forfeited those arguments not objected to below.  (See *Clark, supra*, 63 Cal.4th at p. 577.)

In addition, appellant's arguments are as sparse and lacking in legal citation and meaningful legal argument as those made to the evidence discussed above.  Appellant regularly cites to no meaningful or relevant law, or any law at all, and makes no attempt to explain how the specific facts of the case show prosecutorial misconduct in anything other than a conclusory assertion.  Accordingly, this court finds appellant has forfeited his prosecutorial misconduct arguments on appeal.  (See *Stanley, supra*, 10 Cal.4th at

p. 793.)  However, given the seriousness of prosecutorial misconduct claims, this court briefly addresses each of the nine arguments raised, to show that no misconduct occurred.

*Admitting Exhibit No. 7*

Appellant's first prosecutorial misconduct claim involves exhibit No. 7, videos showing appellant exiting Leach's garage near the time of the shooting.  Appellant contends misconduct occurred because "the prosecution played two videos identified as Exhibit 7 to a witness without memory of the events depicted in the video, without requesting admission of the evidence, and without giving an opportunity for the defense to object."  The record does not support appellant's argument, and no misconduct occurred.

First, the record shows that the video was authenticated by Leach and admitted after appellant expressly chose not to object.  We include relevant notations from the transcript for context:

"[PROSECUTOR:]  Okay.  I'm going to show you what's been marked as People's 7.  There's two videos.  Okay?

"[LEACH:]  Okay.  [¶]  (Whereupon People's Exhibit 7 was identified for the record.)

"[PROSECUTOR]:  [¶]  Q.  So I'm going to play some of one.  I'm playing People's 7, the first video.  I want you to focus on the top right in between those two buildings.  [¶]  (Whereupon People's Exhibit 7 was played.)

"[PROSECUTOR]:  [¶]  Q.  Stopping at 32 seconds.  Now I'm going to show you the second video on People's 7.  Okay?  I want you to focus on the left of the screen right up in this area.  [¶]  (Whereupon People's Exhibit 7 resumed playing.)

"[PROSECUTOR]:  [¶]  Q.  Stopping at 50 seconds.  In People's 7, both videos (a) and (b), do you recognize the area that those videos are showing?

"[LEACH:]  Yes.

"[PROSECUTOR:]  Okay.  What area are those showing?

"[LEACH:]  The back side of my apartment.

"[PROSECUTOR:]  That's how it looked in July of 2022; correct?

"[LEACH:]  Yeah.

"[PROSECUTOR:]  Now, you see the people walking or a person inside your garage; correct?

"[LEACH:]  Yeah.

"[PROSECUTOR:]  Do these videos show a fair and accurate representation of the day of the shooting, July 9th of 2022?

"[LEACH:]  Yeah.

"[PROSECUTOR]:  I would ask that 7 (a) and (b) be admitted.

"THE COURT:  Any objection?

"[DEFENSE COUNSEL]:  No objection.

"THE COURT:  Admitted.  [¶]  (Whereupon People's Exhibit 7 was received in evidence.)

"[PROSECUTOR]:  [¶]  Q.  I'll show you the first video.  So about the top right corner, this video is from [a taco shop]; correct?

"[LEACH:]  Yes.

"[PROSECUTOR:]  So your residence would be down the alleyway across the street; right?

"[LEACH:]  Yeah.  [¶]  (Whereupon People's Exhibit 7 resumed playing.)

"[PROSECUTOR]:  [¶]  Q.  If you look at the screen, the big screen, would it be up here?

"[LEACH:]  Yes."

Second, well-settled law shows that the exchange above properly authenticated the video evidence.  "A photograph or video recording is typically authenticated by showing

it is a fair an accurate representation of the scene depicted. [Citations.] This foundation may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded." (*People v. Goldsmith, supra*, 59 Cal.4th at pp. 267–268.) As shown above, Leach witnessed the events recorded in the video and testified the video was a fair an accurate representation of the scene depicted. The video was thus properly authenticated.

Finally, even if the evidence were inadmissible, this would not be enough to demonstrate misconduct. " 'Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct. Defendant's real argument is that the evidence was inadmissible.' " (*People v. Chatman, supra*, 38 Cal.4th at pp. 379–380.) As explained in *Chatman*, although "the prosecutor in this case certainly asked the questions intentionally, nothing in the record suggests he sought to present evidence he knew was inadmissible." (*Id.* at p. 380.)

*Questioning Leach*

Appellant next argues a brief series of questions the prosecutor asked Leach demonstrate misconduct because Leach "could not answer, because he did not have direct knowledge of the facts." The exchange identified is as follows:

"[PROSECUTOR:] Did you hear any gunshots?

"[LEACH:] No.

"[PROSECUTOR:] Did you tell law enforcement that you heard gunshots?

"[LEACH:] No. If I didn't hear them, I don't think I would have told them that.

"[PROSECUTOR:] Didn't you tell law enforcement where the shell casings would be?

"[LEACH:] No. I didn't even know where he was at."

Appellant appears to contend these questions were improper because they followed at least one question about the video in exhibit No. 7 for which a leading

25.

objection was sustained, which "successfully caused Mr. Leach to appear to have specific knowledge of events." The questions could not constitute misconduct as they were required to properly impeach Leach through extrinsic evidence of his prior inconsistent statements. (See Evid. Code, § 770 [extrinsic evidence inconsistent with prior testimony shall be excluded unless the witness was "so examined while testifying as to give him an opportunity to explain or to deny the statement"].)

*Questioning Shepherd*

Appellant next claims the prosecutor committed misconduct by calling Shepherd as a witness after Leach, and then failing to ask any further questions of Shepherd after Shepherd claimed not to recognize appellant as the person involved in the shooting. According to appellant, in "the context of Mr. Shepherd's testimony taking place directly after Mr. Leach, who testified that he was afraid to snitch in open court, the prosecutor knowingly offered Mr. Shepherd's testimony as proof of Appellant's guilt even when the testimony is contradictory and prejudicial to Appellant's right to a fair trial without offering significant probative value other than suggesting that Mr. Shepherd was not saying Appellant was the suspect out of fear to testify."

We find no support in the record for any inference of misconduct. The questions asked were well within standard practice, seeking identification of appellant in open court, and there is no indication in the record the prosecutor was seeking to elicit improper testimony. The record also shows a 15-minute break occurred between Leach's and Shepherd's testimonies, followed by nearly 10 pages of substantive testimony before the alleged misconduct. There is simply no indication in that series of events that some form of improper conduct was planned in the ordering of the witnesses.

*Questioning Officer Montejo*

Appellant claims in his next contention that the use of a leading question to Officer Montejo, properly objected to, followed by a nonleading version of the question: It "is prosecutorial misconduct if the witness did not remember where the victim was located in the paragraph [*sic*], and gave the leading answer provided by the prosecutor's improper question." This is functionally the entire argument, aside from a single record citation, a claim any objection would be futile, and that "[s]tructural error resulted."

The record shows no error. Leading questions are not always impermissible, and trial courts have broad discretion to decide when circumstances permit their use. (See *People v. Gonzalez, supra*, 12 Cal.5th at pp. 401–402.) Here, the record shows the prosecutor used a leading question in the course of contextualizing the area shown in a picture. When the leading objection was sustained, counsel properly elicited relevant information through the use of nonleading questions, but in a format that did not parrot the impermissible question. While the prosecutor's original question was leading, the method of questioning did not constitute misconduct. Ultimately, the court had discretion to permit the use of limited leading questions to contextualize the location of a photograph, even if it chose not to exercise that discretion. And the record does not show that the leading question triggered any specific improper testimony when rephrased.

*Upholding the Duty of Candor*

Appellant raises two issues where he claims the prosecutor committed misconduct by failing "to comply with his duty of candor." Both of these instances arise from what appellant contends are failures by the prosecutor to correct statements made by the court about witness Garcia or assertions to the court Garcia could state a fact when he could not do so.

The first issue relates to Garcia's expected testimony regarding the 911 call made after the shooting. Outside the presence of the jury, the court took up future evidentiary

issues and trial planning matters with counsel.  In doing so, the prosecutor raised his intent to introduce the 911 call as exhibit No. 10, noting there were two callers on the same phone call, but only one of the two would testify.  The prosecutor believed that witness, Garcia, would be able to "establish that's the phone call."  Upon further questioning, and when reviewing the transcript, the following exchange occurred:

"THE COURT:  So who is going to testify, Fatui or Garcia?

"[PROSECUTOR]:  Garcia.

"THE COURT:  Garcia is the guy that says, 'the guy on the bike'?

"[PROSECUTOR]:  Yes."

Later in the discussion, additional challenged statements were made as follows:

"THE COURT:  Is Fatui—did somebody subpoena Fatui?

"[PROSECUTOR]:  He was subpoenaed and remained on call.  He didn't show up today.  I haven't had an opportunity to give him a call, but in any event, we can establish the foundation for the 911 call itself through Garcia, who is also on the call.

"THE COURT:  Garcia also says he can identify the guy on the bike.  Okay.  Well, the 911 call itself, I don't know why that wouldn't come in, but the issue that [defense counsel] brings up is a valid issue of having Fatui here to testify.

"As far as 911, if foundation can be laid through Mr. Garcia or it's obvious that it's spontaneous for Mr. Fatui, then it comes in."

This exchange preceded the eventual admission of exhibit No. 10, which was discussed more fully above.  Appellant attempts to incorporate his prior arguments regarding the admissibility of that exhibit, as well has his arguments regarding the admissibility of exhibit No. 7 and the allegations of judicial bias, in support of his argument for prosecutorial misconduct.

The second issue involves the direct admission of exhibit No. 10 and attempts to incorporate the first issue (relying on Garcia to introduce the 911 call), appellant's

judicial misconduct assertions related to exhibit No. 10, and appellant's admissibility arguments regarding exhibit No. 10 to argue the prosecutor committed misconduct by "failing to correct the Court and withdraw the foundationless evidence offered."

The arguments lack merit. Appellant contends it was misconduct for the prosecutor to fail to correct statements from the trial court that suggested Garcia knew more than he would actually testify to. However, there is no doubt that Garcia was a witness with relevant information, none of the court's statements were made in front of the jury, no rulings depended upon the alleged misconduct, and the underlying evidence was properly admitted in open court based on the actual statements made by the witness. (See *Clark, supra*, 63 Cal.4th at p. 577 [conduct proper when prosecutor does "not attempt to elicit *inadmissible* evidence" and challenged evidence is properly admitted.) Ultimately, the contested statements by the court related to identifying the witness's relevance to the case and carried no material weight in the trial. (See *Levine v. Berschneider* (2020) 56 Cal.App.5th 916, 921 [duty of candor requires correction of material facts in some contexts].) Even if an error could be identified, the failure to correct the court's potential identification of the witness as one that could identify the shooter could result in no prejudice to appellant.

*Vouching For Facts During Closing Argument*

In what is best described as a challenge to the entire case, appellant contends the prosecutor committed misconduct by improperly vouching for facts not in evidence during closing arguments. Appellant first challenges the contention that this was a crime of retaliation, then contends the prosecutor improperly commented on Leach's testimony by suggesting he was scared of retaliation, then challenges comments that Garcia saw appellant participate in the crime, then challenges comments that relied on Leach's initial statement to police, then provides an extended excerpt of comments related to Shepherd's testimony to challenge any allegation appellant was involved in the crime, then

challenges the prosecutor's arguments supporting appellant's alleged intent to kill and premeditation, then challenges the prosecutor's view of appellant's self-defense evidence, and finally challenges the prosecutor's argument for conviction of the firearm counts for an alleged lack of evidence.

This court's review of the factual record and arguments shows these contentions lack merit. " ' "[A] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." ' " (*Peoples, supra*, 62 Cal.4th at p. 796.) Appellant's identified issues either fall clearly within this permissive type of argumentation or require the court to read the record in an unsupported fashion to accept.

On the retaliation issue, appellant's argument there was no supporting evidence fails to acknowledge appellant's statement to police that he fired at a man who had attacked him previously and the tattoo tying Galaviz to a local gang. With respect to Leach's testimony, appellant fails to acknowledge Leach's statements to police, focusing only on his trial testimony and failing to acknowledge Leach's testimony that although he was not scared to testify, "It's just I have to live in this place. Where I live is, you know, it's not an easy area to live in."

Appellant contends the prosecutor improperly vouched that Garcia "testified that Appellant fired two rounds and went into the alleyway after … Galaviz" and, relatedly, that Leach testified appellant rode his bike "back down the alleyway." Appellant then contends such claims were contradicted by Shepherd's testimony. But a review of the transcript does not show such vouching. Rather, as shown below, the prosecutor was merely recapping testimony from various witnesses and video evidence and then properly narrated how the prosecutor viewed that evidence:

"Now, Sergeant [Eric] Celedon assisted in the interview of [appellant] on August 12th, and during that interview, really, [appellant] corroborated everything that Leach

said, everything that the witnesses said.  If you recall, Freddy Garcia also told you that he goes outside to help Rodolfo Galaviz, and he sees that person on the bike in that area, just as [appellant], in his interview, says that he rode toward Galaviz.

"After firing those two rounds, [appellant] goes towards Galaviz going after him, sees him go in that alleyway going after him.  Then he heard that 911 call.

"We also heard where [appellant] went after the shooting from Brian Leach.  We confirmed that from [three surveillance] video[s].  There [appellant] rides back down the alleyway."

Appellant's argument ignores appellant's own admissions to police and appears to suggest that the prosecutor could not make inferences from multiple sources of evidence, a point which finds no support in the law.  Nor does appellant point to any law demonstrating the prosecutor cannot argue reasonable inferences off of contested evidence.  And appellant further fails to acknowledge testimony that Garcia did see a person that could be inferred to be appellant riding down an alley after the shooting.  As the prosecutor's contested statements are fair interpretations of the evidence, appellant's citations do not demonstrate improper vouching.  (See *Peoples, supra*, 62 Cal.4th at p. 796.)

Likewise, appellant's allegation that the prosecutor committed misconduct by arguing the evidence supports either an intent to kill or planning and preparation fail to show vouching.  The relevant statements—arguing appellant's conduct demonstrated "a step beyond planning and preparing" and that one does not "fire a gun at someone not intending to kill them" —are fair commentary on the evidence, and appellant's contrary contentions rely wholly on interpreting the evidence in a different manner.  (See *Peoples, supra*, 62 Cal.4th at p. 796 [prosecutor may vigorously argue their case and make fair comment upon the evidence].)  With respect to the contention the prosecutor used an improper "hypothetical about how premeditation can be created for violating a traffic

code," appellant provides no citation to the argument, and the court's review of the relevant transcript shows no error. Indeed, similar arguments are regularly affirmed as proper. (See *People v. Son* (2020) 56 Cal.App.5th 689, 699–700.)

Finally, appellant contends the prosecutor could not properly argue appellant had time to cool off between allegedly being attacked and committing the shooting because the "prosecutor admitted that there was not enough evidence to show that Appellant was beat up by somebody either two days or 20 or 30 minutes prior to the alleged crime." Again, we see no error. The evidence—coming in the form of the same statement to police which appellant fails to discuss above—was unclear as to specifically when appellant contended he had previously been attacked or how many times. And it was fairly disputed whether appellant was making these statements to generate a self-defense claim in response to his interrogator's statements or because they were true. The prosecutor's comments thus fell well within the rights to make fair comments on the evidence and draw reasonable inferences therefrom. (See *Peoples, supra*, 62 Cal.4th at p. 796.)

Accordingly, whether considered individually or collectively, appellant has failed to demonstrate improper vouching by the prosecutor, let alone how such conduct could be considered deceptive or reprehensible or that so infected the trial with unfairness as to make the resulting conviction a denial of due process. Even were this court to consider the possibility of an error in this context, appellant fails to argue prejudice or overcome the presumption that the jury followed the instructions provided to it. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 30.) In this case, those included an instruction that the jury "must impartially compare and consider all the evidence that was received throughout the entire trial" and a specific admonition during closing arguments that "[e]ach of the attorneys, in their closing argument, they argue what they believe the evidence was and

how they believe it fits into the law and what they think you should decide.  But that's up to you to decide.  This argument.  It's not evidence."

*Burden Shifting*

Appellant contends misconduct occurred during the rebuttal closing argument when the prosecutor referred to both parties having subpoena powers.  Appellant contends the use of the word power "misled the jury" and "suggested that the defense has an equal amount of power to wield" as the prosecutor.

Notably, appellant objected that the argument constituted improper burden shifting.  Although the court overruled the objection, it then stated, "I just want to remind the jury that there's no obligation for the defense to prove anything.  They don't have to call any witnesses and whatnot.  As far as what witnesses were called or what witnesses were not called, you do with the evidence that you receive and you have been given jury instructions."  The prosecutor then continued with the rebuttal argument, affirming the defense had no burden to prove any point but noting the defense could have called any witness with information if it wanted to.

This court finds no error.  It is well settled that " 'where the defendant opens the door to an argument, it is "fair advocacy" for the prosecution to enter,' " and that this principle applies to situations where prosecutors comment on the ability to subpoena witnesses when the defense raises concerns about not hearing from individuals.  (*U.S. v. Williams* (9th Cir. 1993) 990 F.2d 507, 510.)  Particularly in rebuttal, such comments fall within the ability to comment on the failure to call logical witnesses and do not shift the burden of proof.  (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 [noting "it is neither unusual nor improper to comment on the failure to call logical witnesses"].)

Here, the prosecutor's argument was made specifically in response to arguments that certain witnesses were not called and only generally informed the jury that both sides could call witnesses if needed.  Nothing in the exchange rises to the level of improper

argument, let alone prosecutorial misconduct.  Even if an error were found, the trial court admonished the jury.  We presume the jury followed those instructions, and there is no evidence rebutting that presumption.  (*People v. Washington* (2017) 15 CalApp.5th 19, 26.)  Appellant has shown no prejudice.

*General Bias*

Finally, appellant argues the prosecutor committed misconduct by simply prosecuting this case due to claims "the police had a preconceived theory that a Hispanic male committed this crime" and a "common prejudice in Bakersfield that homeless people or poor people are more likely to commit crimes."  According to appellant, the prosecutor had a duty to follow the evidence "even if it exonerates a suspect as should have occurred in this case as there was not enough evidence submitted at trial to prove Appellant's guilt beyond a reasonable doubt," and that adopting the police's confirmation bias was misconduct that prejudiced appellant.

As discussed further below, appellant's claim that insufficient evidence supports his conviction has not been proven in this appeal.  Appellant's argument thus wholly rests on general and unsupported accusations of bias on behalf of the police, the prosecutor, and the entire city of Bakersfield.  This court finds no basis to conclude such broad, unfounded allegations support a claim of prosecutorial misconduct.

*Misconduct on Appeal*

In his reply brief, appellant dedicates two independent arguments to claiming the People committed misconduct in their appellate briefing.  The first, titled "The [Respondent's Brief] Committed Misconduct of Vouching that Substantial Evidence was Proffered to Establish that John Doe is a Victim to Justify Not Identifying Him or Proffering Any Evidence that He Could Have Accused Appellant of a Crime" (boldface omitted), focuses on complaints surrounding the fact that "John Doe" was not called as a witness.  It generally concedes the People's argument that not all witnesses need to be

34.

called but goes on to suggest that not calling John Doe "may be an implied *Brady* violation," implies without support that John Doe may have been the actual shooter, and reiterates allegations of error tied to the right to confront witnesses. The second, titled "The [Respondent's Brief] Committed Misconduct of Vouching that Rodolfo Galaviz is the Victim of Appellant and Not Someone Else Without Evidence to Justify Not Identifying John Doe or Proffering Substantial Evidence at Trial" (boldface omitted), raises similar arguments but focuses on Galaviz. It contends, "[I]t is piling misconduct upon misconduct to intentionally ask the Court of Appeals to presume the fact that Mr. Galaviz was specifically a victim of Appellant where insufficient substantial evidence was proffered to support the verdict."

In neither argument does appellant cite to any legal authority showing arguments made on appeal constitute reversible misconduct. Moreover, no argument of actual misconduct is cogently made. Rather, appellant's arguments appear to generally reference claims rejected above that are related to the need to call certain witnesses and the general sufficiency of the evidence, but this time under the inflammatory headings of alleged misconduct. The lack of directed argument or legal authority on the claim of misconduct forfeits this claim on appeal. (*Stanley, supra*, 10 Cal.4th at p. 793; *People v. Smith, supra*, 30 Cal.4th at p. 616, fn. 8.) Even if this court were to assume an appellate vouching misconduct claim could be supported in the law—a point on which this court is skeptical—appellant could not prevail because he has failed to show any prejudicial error in the trial court that would affect the claimed misconduct on appeal. (See *People v. Turner* (2004) 34 Cal.4th 406, 433 [claim denied where there was no reasonable probability that the prosecutor's improper vouching affected the verdict].)[7]

---

[7] Appellant also includes "new" misconduct claims in several other sections of his reply brief. As an example, in two different instances under different headings, appellant claims that relying on his statements to police "is a new instance of prosecutorial

<u>***Appellant's Ineffective Assistance of Counsel Claims***</u>

Appellant makes three allegations of ineffective assistance of counsel.  First, appellant challenges counsel's failure to object to exhibit No. 7, the videos shown to Leach.  Second, appellant asserts counsel should have asked more questions of Shepherd to reenforce his claim he did not see the suspect in the courtroom.  Third, appellant claims, "[D]efense counsel's failure to make any case for the defense was ineffective assistance."

*Standard of Review and Applicable Law*

To establish ineffective assistance of counsel, appellant must show that counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Id.* at p. 694.)

" 'Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts.  [Citation.]  To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation .…" ' "  (*People v. Hart* (1999) 20 Cal.4th 546,  623–624.)  "An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel."  (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)

---

misconduct" on the theory that the confession was false.  This court finds no merit in these contentions.

36.

*Appellant Has Not Shown Ineffective Assistance of Counsel*

Appellant's first allegation, that counsel should have objected to exhibit No. 7, does not demonstrate conduct below an objectively reasonable standard. As discussed above, exhibit No. 7 was properly authenticated and admitted. As the evidence was properly admitted, the failure to object cannot demonstrate ineffective assistance of counsel. (See *In re Avena* (1996) 12 Cal.4th 694, 721 [ineffective assistance of counsel requires showing counsel's unprofessional errors were prejudicial].)

Appellant's second and third allegations, that additional questions should have been asked of a witness and an affirmative defense should have been presented, are clearly directed to tactical decisions made by counsel. (See *People v. Cleveland, supra*, 32 Cal.4th at p. 746 [scope of cross-examination normally a tactical decision]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 [decision not to put on evidence is tactical].) The record does not demonstrate why counsel failed to act in the manner now suggested on appeal. However, it is far from apparent that there could simply be no satisfactory reason for counsel's conduct. Counsel could have reasonably chosen not to question Shepherd further on his failure to identify appellant because he already had a clear statement on that point to contrast with the positive identification already provided by Leach, and further questions could reasonably be deemed a risk to that conflict in evidence. Similarly, counsel could have reasonably decided not to put on an affirmative defense in order to bolster an argument that the prosecution failed to meet its obligation to prove the charges beyond a reasonable doubt. (See *Mitcham*, at p. 1059 ["Reasonably competent counsel could have determined to wait to hear the prosecution's case before deciding whether to present a defense. Defendant's counsel could have determined that the defense's strongest argument was that the prosecution had failed to prove its case beyond a reasonable doubt."].) As appellant's counsel notes, trial counsel identified numerous alleged holes in the prosecution's case and argued them extensively. There is simply no

37.

basis on this record to support a claim it was ineffective for counsel to make these tactical decisions.

### *Appellant's Sufficiency of the Evidence Claim*

Appellant contends that all verdicts in this case are premised on inconclusive circumstantial evidence that points to innocence and are not supported by substantial evidence. Relying primarily on the standard jury instruction that one must accept those inferences that point to innocence when two or more reasonable conclusions can be drawn from circumstantial evidence, appellant incorporates in summary fashion "27 reasonable doubts" presented in appellant's closing argument, which appellant contends "show that there is not adequate evidentiary grounds to justify a guilty verdict here." Appellant then claims to repeat "in full here" his arguments regarding prosecutorial misconduct during closing arguments, his argument that the prosecutor failed to produce Fatui as a witness to authenticate the 911 call, and his argument that the prosecutor failed to produce the two alleged victims to show "the trial was fatally devoid of substantial evidence" and "so incomplete no reasonable jury would have convicted Appellant."

From there, appellant appears to focus his contention, arguing "no gun was discovered, no bullets, and to [*sic*] bullet casings that did not match. No witnesses saw Appellant shooting a gun or using a gun, and only Mr. Leach stated that he saw Appellant with a gun in out-of-court statements made without an oath, which he contradicted on the stand." Appellant argues this demonstrates a lack of substantial evidence "to establish counts 2, 3, 4, 5, 6, and 7, and there was no way for the jury to find guilt for semi-automatic firearms rather than merely a firearm." Appellant contends he could not be found guilty of possessing ammunition because "no bullets were recovered or connected in any way with Appellant" and "no substantial evidence" showed any "alleged delay or resisting of a police officer" for count 8. Finally, appellant argues, "[C]ounts 1 and 9

required method [*sic*] of potentially murdering the victims, like shooting a gun at them, but there was not enough substantial evidence to prove these charges," and self-defense "was not disproven by the prosecution."

Appellant summarizes his claims by arguing there "was no substantial evidence linking Appellant to the crime and the circumstantial evidence allowed the jury to conclude the wounds were not caused by guns, that Appellant had no clear motive, and that Appellant was not the perpetrator, each point of which leads to a conclusion of innocence. Therefore, according CALCRIM 224 [*sic*] the jury was required to find in favor of innocence." Notably, throughout these arguments, which do not delve substantially deeper than outlined above, appellant does not cite to a single case or compare any of the factual statements to specific elements of the underlying crimes. Indeed, appellant's only citation is to *People v. Zammora* (1944) 66 Cal.App.2d 166, 236, which comes after the arguments above and block quotes a general sentiment that while it is "greatly to be desired for the safety of the public that the guilty be apprehended and punished … it is of equal or greater importance that the guaranty of a fair trial … be assured."

*Standard of Review and Applicable Law*

Reviewing a verdict for substantial evidence is a well-defined process. "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of

the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " (*Stanley, supra*, 10 Cal.4th at pp. 792–793, third and fourth bracketed insertions in original.)

### *Appellant Has Forfeited the Assertions Raised*

Throughout this appeal, this court has noted the severe lack of reasoned argument and complete lack of citation to relevant law on the points raised warrants a finding appellant has forfeited his arguments on appeal. This argument is no different. As explained in *Stanley* and cited regularly in this opinion: "Defendant does not specify how the evidence fails to support the verdict. Instead, he merely refers us to the statement of facts contained in his opening brief, apparently assuming this court will construct a theory supportive of his innocence and inconsistent with the prosecution's version of the evidence. That is not our role. '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.] This principle is especially true when an appellant makes a general assertion, unsupported by specific argument, regarding insufficiency of evidence." (*Stanley, supra*, 10 Cal.4th at p. 793, third bracketed insertion added.) In this case, appellant raises numerous assertions that his conviction lacks substantial evidence but fails to support those claims with meaningful argument and citation to the law. While the outline of appellant's argument can be discerned through additional research and careful consideration of the claims made, it is not this court's role to make his arguments for him.

As in *Stanley*, appellant's arguments are too general and unsupported to allow for meaningful consideration and are deemed forfeited.

*This Court Finds Sufficient Evidence on the Assertions Raised*

In line with the analysis in *Stanley*, this court has nonetheless "reviewed the record in light of the standard of review enunciated in the authorities discussed above" and in the context of the arguments disposed of above. (*Stanley, supra*, 10 Cal.4th at p. 793.) This court finds the evidence is sufficient to support the convictions under the assertions counsel has raised. Appellant's positions all turn on weight of the evidence contentions that appellant was not the person on the bike, did not possess a gun—let alone a semiautomatic weapon—or ammunition, did not use a gun to cause harm to any person, had no motive to commit these crimes, and could rely on a self-defense claim, regardless. But as noted above, appellant's and Leach's statements to the police, if believed by the jury, demonstrate appellant was present at the scene and at the time of the shooting, was the person on the bike, and was in possession of a semiautomatic firearm. Appellant's statements to police further provide multiple reasons for his actions, many of which disprove allegations of self-defense or heat of passion manslaughter, all of which the jury weighed when reaching its verdict. Further, the investigatory evidence, video evidence, and percipient witnesses to the aftermath of the shooting clearly support a conclusion that at least two shots were fired, that one of those shots struck Galaviz, and that at least two individuals fled from the spot of the shooting. Finally, contrary to appellant's contention, trial testimony affirms he ran when confronted by police, and body camera footage showed the subsequent chase. Appellant's claim on appeal that substantial evidence fails to support any of the charges in this case is thus without merit.

*The People's Limited Concession*

In their responsive brief, the People note that "although not specifically raised by appellant," appellant appears to have been convicted of multiple offenses for the same

41.

act.  More specifically, the People note that counts 4 and 5 (assault with a firearm) are lesser included offenses of counts 2 and 3 (assault with a semi-automatic firearm).  (See *People v. Martinez* (2012) 208 Cal.App.4th 197, 199 ["A semiautomatic firearm assault cannot be committed without also committing a firearm assault.  Therefore, firearm assault is a lesser included offense of a semiautomatic firearm assault."].)  Appellant does not acknowledge this concession in his reply.  Upon review, we agree with the People's concession and will strike the lesser included firearm assault convictions (counts 4 & 5).

**DISPOSITION**

The convictions for assault with a firearm (counts 4 & 5) are stricken.  The judgment is otherwise affirmed.


                                                                      FRANSON, J.
WE CONCUR:


LEVY, Acting P. J.


FAIN, J.[*]

_____

[*]       Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.